[,BYRNES, Judge.
Lance Sarkozy was charged by bill of indictment on April 2, 1998, with second degree murder, a violation of La. R.S. 14:30.1. At his arraignment on April 7 th, he pleaded not guilty. The trial court found probable cause and denied the motions to suppress the evidence and the confession on June 18 th. After trial on August 10th, a twelve-member jury found him guilty of the lesser included offense of manslaughter. He was sentenced on August 19 th to serve forty years at hard labor. The defendant’s motion for reconsideration of sentence was denied, and his motion for an appeal was granted.
At trial, Sheila Tebay testified that she and the defendant had been living together *347 for about nine months prior to March 5, 1998, the day of this incident. She and the defendant were renting an apartment at 1439 St. Andrew Street with Richard Miz-zell, a friend of Ms Tebay’s for about eight years. On cross-examination, Ms Tebay said that although she was never romantic with Mi-. Mizzell, he had “always” been in love with her. On March 5, 1998, the defendant returned from work about 6 p.m., and when Richard Mizzell came in about an hour later, they resumed an argument begun earlier that day. The defendant wanted to borrow a quarter from Mizzell, who would not lend more money because the | {.defendant already owed him $10. While Richard Mizzell was sitting on the couch eating, the defendant went into the bedroom and returned with a table leg. The defendant hit Mizzell with the table leg so hard that Mizzell fell from the couch. When Mizzell tried to get up, the defendant hit him between five and ten times and told him that he was not going to get up. Mr. Mizzell asked the defendant why he was being attacked, and the defendant replied, “because ... [Mizzell] was an ass hole and because he caused us so much trouble, he [the defendant] said he was going to make him suffer like he made us suffer.” The defendant then sat down on the couch still holding the table leg. Ms Tebay said he warned her not to go out or call the police; she said she was frightened that he would hit her. Meanwhile Mr. Mizzell began to move and groan, and the defendant hit Mizzell’s arms and legs, saying “he [the defendant] was going to cripple him so he [Mizzell] couldn’t use his legs and ... arms.” The defendant and Ms Tebay then watched television for about an hour. At that point, the defendant said, “Well, it’s time for you to die. I’m tired of sitting here listening to you.” The defendant took a hammer from a drawer; he told Ms Tebay to turn away and not to look, and he hit Mizzell on the head with the hammer several times. Mizzell “gagged a few times” before becoming silent. The defendant then said, “He’s dead now,” and “[W]e can go get us something to eat. Go out and get us a beer at the bar.” The couple walked to St. Mary’s Tavern where they stayed until about 11:30 p.m.; they left because the bar was closing. As they were walking to a nearby pizza restaurant, Ms Tebay asked what the defendant planned to do, and he replied, “We’re going back to the house and pretend like nothing happened.” He also suggested that they “[s]ay somebody must have broke in or something.” Ms Tebay told him that she had left her ulcer medicine at her friend’s, and she was going to get it; she agreed to meet him back |sat the apartment to eat the pizza. When she got to her friend’s place, Ms Tebay asked for a ride to the police station. She tried to find the station, but got lost and found police officers at the Trolley Stop Restaurant on St. Charles Avenue. She told the officers of the murder and accompanied them in the police car to the apartment. When they arrived, the defendant was asleep in the bedroom. Under cross-examination, Ms Tebay admitted she had two prior felony convictions. She also said she “probably” mentioned that she would get a life sentence if she were convicted again.
Dr. William Newman, an expert in forensic pathology, testified that on March 6, 1998, he performed an autopsy on Richard Mizzell. He determined that Mr. Mizzell died of multiple head injuries. Dr. Newman found the following:
He had lacerations of his scalp. He had fractures of his skull. He had fractures of his nose. He had lacerations of his face. And multiple skull fractures, many of them depressed. Which means that the skull itself was sunken into the head. And there was also damage to his brain. There was an accumulation of blood beneath the dura or covering of the brain between the dura and the brain tissue itself. And there were contusions on both sides, which are like bruises, also on brain tissue.
The doctor also reported four bruises on the left shoulder, bruises on his hand, *348 blood blisters on his hands, lacerations on his lip, cheek, left brow and above the left ear. The doctor concluded that the victim was hit multiple times by a blunt object, but he could not say the wounds were a result of being hit with a hammer and/or, a wooden table leg.
Officer Michael Russell testified that after midnight on March 6, 1998, he and his partner, Cyril Evans, were having coffee at the Trolley Stop Restaurant on the corner of St. Andrew Street and St. Charles Avenue when a white woman | ¿approached them. After a conversation with her, the officers accompanied her to an apartment at 1439 St. Andrew Street. There they found a man’s body in the living room, and a bloody hammer and chair post next to him; in a bedroom the defendant was asleep or passed out on a bed. The officers woke him.
Sergeant Gary Márchese testified that he was in charge of the investigation into the death of Richard Mizzell. Sergeant Márchese had photographs of the scene which were shown to the jury. The sergeant also took a statement from the defendant; the jury heard a tape of that statement. Sergeant Márchese said that when he arrived at the apartment, the defendant and Ms Tebay were seated in the kitchen. When he heard the defendant call her a “fucking bitch,” he decided to separate the couple. The sergeant said the defendant appeared to be hostile.
Lance Sarkozy testified that on March 5, 1998, he was in the process of moving into another apartment, and Ms Tebay had moved out about a week before; however, they were both in the apartment drinking beer late in the afternoon. The defendant said Ms Tebay was “pretty drunk.” The argument between the defendant and Miz-zell had been about $10 that the defendant owed Mizzell, and it occurred in the morning. When Mizzell came in that evening, he turned the television volume to the maximum and picked up a hammer. He .approached the defendant, lifted the hammer, and brought it down so that “it just barely nicked my face.” The defendant picked up a table leg that was in the room and hit Mizzell, who fell at the defendant’s feet. The defendant picked up the hammer and sat on the couch until he noticed Mizzell getting up and coming toward him with the table leg. Then the defendant hit him three times on the head with the hammer. Mizzell “spun around and hit his head on this ... park bench kind of thing. .... He didn’t move. It killed him.” The defendant decided to leave the apartment, and he and|sMs Tebay went to a bar where they drank for two hours. They spoke of telling the police about it, and the defendant said he realized his fingerprints were “all over it.” The defendant said that after they got the pizza, Ms Tebay decided to go to her own apartment, and he went upstairs to go to sleep. When she came in with the police, he was not asleep but he had his eyes closed. He confirmed Ms Tebay’s story that she had nothing to do with the incident; he said they had agreed that she would call the police from her apartment. The defendant was asked to explain the statement he gave to the police that was read to the jury in which he said he never harmed Mizzell and did not even know anything about the murder. He said that on the night of the murder he was drunk and could not remember what had happened. He admitted at trial that he hit the victim at least five times but only because the victim attacked him. When asked on cross-examination if he had lied to the police on March 6th, the defendant admitted that he had lied. After the prosecutor asked about how “you left that man,” the defendant answered, “But that’s how he would have left me.”
In a single assignment of error, the defendant argues that his sentence is excessive. He received the maximum sentence under La. R.S. 14:31 of forty years at hard labor. He maintains that the sentence is excessive because he is a first offender, the sentence was not justified, and it was disproportionately harsh com *349 pared to sentences of other persons convicted of manslaughter.
Article 1, Section 20 of the Louisiana Constitution of 1974 provides that “No law shall subject any person ... to cruel, excessive or unusual punishment.” A sentence, although within the statutory limits, is constitutionally excessive if it is “grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless and needless imposition of pain and suffering.” State v. Caston, 477 So.2d 868, 871 (La.App. 4 Cir.1985). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La. C. Cr. P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La.1982).
If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case. State v. Caston, 477 So.2d 868, 871 (La.App. 4 Cir.1985). The reviewing court must also keep in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
At the sentencing hearing on August 19, 1998, the trial court stated:
I think that the Jury was very, very kind and with the submission of all the records and what I heard, I believe that there is an undue risk that during the period of a suspended Sentence [sic] or probation that the defendant will commit another crime. The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution. A lesser sentence will deprecate the seriousness of the defendant’s crime. I think that the Offender’s [sic] conduct during the commission of the offense manifested deliberate cruelty to the victim. I think that the offender knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to disability that occurred after the first set of blows. I think that the offender used act [sic] of violence in the commission of this offense.
The judge then declared that the sentence would be forty years at hard labor, and the defense objected and filed a motion for reconsideration of sentence. The judge responded:
|7I can rule on that right now. I think that the Jury was very kind. I sat through it. Not only did I see all the pictures but I sat through this entire matter. This is one of those matters that had he been charged with Manslaughter [sic] and fled[,] the Sentence [sic] might have been a little less than that. Let me tell you something. The Sentence [sic] might have been even a little less this morning. All he had to do was just say he was sorry for what he did. I gave him a chance twice, twice. I said, “Is there anything you want to say?”, and he doesn’t want to say anything. I gave him a chance twice, twice, and he shows no remorse, no remorse. This is a case that I heard where he beat the man’s skull in, hit him several times. He can’t even put up any self-defense. He didn’t have a scratch on him. A picture was taken on the day of his arrest. So it wasn’t any self-defense. He wasn’t hit at any time. He let the man lay there on the carpet on the floor and bleed. Then when he was ready to leave he told him it was time to die. Vicious, cruel, and no there won’t be any reconsideration by this Court. .... There was no reason for this crime to take place.... [It was] [Unusually cruel, vicious, heinous.
Here the trial court considered the sentencing guidelines under La.C.Cr.P. 894.1 in his reasons for judgment. Obviously his *350 primary reason for imposing the maximum sentence is a sense of shock and outrage at the “cruel, vicious, heinous” quality of this crime.
The defendant cites State v. Soraparu, 93-1636 (La.App. 4 Cir. 1/19/95), 649 So.2d 1100, 1105, for authority for the proposition that the sentence is disproportionately harsh compared to other -sentences for manslaughter for a first offender. However, State v. Soraparu does not support the defendant’s position because the Louisiana Supreme Court reversed this Court’s opinion and reimposed the trial court’s forty year sentence on the first offender defendant. State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608.
| ¡¡Furthermore, the defendant in the instant case was more violent than the offender in Soraparu. In the case at bar, Ms Tebay testified that although the men disagreed over money, there was no immediate provocation for the attack. In Sora-paru, the defendant shot once and fled. In the case at bar, after the defendant severely beat the victim with a wooden table leg, he sat and watched television while the man groaned; then he struck the victim with a hammer until he knew the defendant was dead. Unbelievably, he then went to a bar, drank for two hours, bought a pizza, returned to the apartment and either fell asleep on the bed or at least tried to fall asleep. When he was arrested, he told the officers he knew nothing about the incident. In his reasons for judgment, the judge properly characterized the defendant’s behavior as unusually “cruel, vicious, heinous.” The judge was shocked that the defendant showed no remorse even at the time of sentencing. One cannot imagine a more glaring example of the worst sort of manslaughter offender nor one for whom the maximum term of imprisonment was designed.
The next inquiry is whether the sentence is excessive in light of sentences imposed by other courts in similar circumstances. This sentence does not appear excessive in light of the jurisprudence. In State v. Bowman, 95-0667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, writ denied, 96-2070 (La.1/31/97), 687 So.2d 400, this Court affirmed a thirty-three year manslaughter sentence for a first offender who drove the car but did not pull the trigger in a drive-by shooting. In State v. Black, 28100 (La.App. 2 Cir. 2/28/96), 669 So.2d 667, writ denied 96-0836 (La.9/20/96), 679 So.2d 430, the Second Circuit affirmed a forty year sentence for a twenty year old defendant who pleaded guilty to a reduced charge of manslaughter; the defendant kidnapped the victim and killed him in a robbery attempt.
|9The trial court has great discretion in sentencing within statutory limits. State v. Trahan, 425 So.2d 1222 (La.1983). A sentence should not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Washington, 414 So.2d 313 (La.1982). In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is “ ‘whether the trial court abused its broad sentencing discretion, not whether another sentence might. have been more appropriate.’ ” [Cites omitted]. For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. Art. I, § 20, i.e., when it imposes “punishment disproportionate to the offense.” [Cite omitted]. In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, [cite omitted], a remand for resentenc-ing is appropriate only when “there appear[s] to be a substantial possibility that the defendant’s complaints of an excessive sentence ha[ve] merit.” [Cite omitted].

(Id).

In the case at bar, we find that the trial court adequately considered circumstances *351 according to La.C.Cr.P. art. 894.1 before imposing the sentence. We further find that the defendant’s sentence of forty years at hard labor is not excessive in light of the circumstances of this case. The jury found that the facts supported a conviction for manslaughter, and the court supported the imposition of the maximum sentence with a strong statement. We cannot say the sentence is constitutionally excessive.
The defendant points out what he terms an error patent in that the trial court failed to advise defendant of the time limitations that govern filing an application |infor post-conviction relief as required by La.C.Cr.P. art. 930.8, subd. C. However, the failure to inform a defendant of this time limitation does not bestow an enforceable right. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, 526, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. There is no merit in this argument.
For the foregoing reasons, we affirm the defendant’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.